THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GEORGE HERMAN, et al.,
        Plaintiffs

    -vs-

COUNTY OF LAKE, et al.,
        Defendants.

No. 06 C 6888
Judge Bucklo
Magistrate Judge Cole

PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT
AGAINST CERTAIN INDIVIDUALLY NAMED DEFENDANTS

    Now come the Plaintiffs, by their attorneys Gregory X. Gorman and James A. Stamos, and submits the following Memorandum in support of their Motion for Partial Summary Judgment Against Certain Individually Named Defendants:

**DESCRIPTION OF THE PARTIES TO THE MOTION AND THE RELIEF SOUGHT**

    Plaintiffs have filed an 11 Count First Amended Complaint against the County of Lake, the Lake County Metropolitan Enforcement Group, and 16 individually named agents/officer Defendants arising out of a warrantless raid and invasion of the Plaintiffs' home at 915 Yeoman St., Waukegan Illinois, and December 14, 2004.  Plaintiffs, by this Motion seek Summary Judgment on Counts II (all Plaintiffs §1983 claim for False Arrest in violation of the Fourth and Fourteenth  Amendments; Count III (all Plaintiffs §1983 claim for Wrongful Detention and Imprisonment without due process and in violation of the Fourteenth Amendment);

1

Count V (minor Plaintiffs claims for False Arrest under State law); and Count VI (minor Plaintiffs claims for False Imprisonment under State law).

The Plaintiffs consist of three generations of a single extended family, ranging from grandchildren to grandparents. They are: George Harmon; his wife Jacqueline Harmon; their adult daughter Shavanna Smith- Durham; Shavanna's husband Jason Durham, Sr.; George and Jacqueline's sons Akilus (age 16)[1] and Darius (age 12); and the following children of Shavanna and Jason Durham, Sr.: Jamese Auston (age 12); the twin boys Javell Smith and Jamell Smith (age 11); Jocqui Wardell (age 9); Jason Durham, Jr. (Age 6).

The motion for Partial Summary Judgment is brought against ten individual Defendant officers for whom there is no genuine issue of material fact that they were among those officers who participated in the warrantless raid of Plaintiffs' home, the arrest and seizure of the Plaintiffs, and the warrantless search of the home. They are officers: Chris Dador, Ken Free (deceased), Wendy Dumont, Anthony Grunder, Johnny Jiminez, Clarence Kropp, Michael Rodriguez, Keith Schultz, Aaron Tokarz and Patrick Zimmerman. All of the respondent Defendant officers were acting as agents of the Lake County Metropolitan Enforcement Group ("LCMEG")at the time of the complained of activity.

**THE RAID ON PLAINTIFFS' HOME**

On December 14, 2004 agents of LCMEG planned a buy/bust drug sting targeting an individual named Hicks who lived at 921 Yeoman Street in Waukegan, two houses north of

---

[1] All ages for the children are given as of the date of the complained of incident, December 14, 2004.

Plaintiffs home at 915 Yeoman Street.(Pl. Ex. B[2]) For this operation Agent Charles Foy posed as a drug buyer for the purposes of arresting Hicks. At the time of the buy/bust operation, Jacqueline Harmon was preparing to take the minor children to the Boys and Girls Club which was about 2 miles from their home.  (Plaintiffs' R. 56.1 Statement of Facts in support of this motion, hereinafter "PSOF" 3)

   Akilus, Darius, Javell and Jason Jr. were in front of the house and waiting for Jacqueline, standing next to her van which was parked on the street in front of the house. The children saw two vans come speeding up Yeoman Street, one from the left and one from the right. One of these vans pulled up at the driveway of the Hicks house at 921 Yeoman, the another pulled up near the front of the driveway by the Harmon family van at 915 Yeoman. Six-year-old Jason Jr. got scared and ran into the house, yelling "Drive-by!" as he ran. While running into the house Jason looked back and saw two or three people dressed all in black with ski mask over their faces running after him.  He ran all the way to his upstairs bedroom and crawled under his bed. Akilus heard Jason yell "Drive-by!"  and saw him start to run to the house. (PSOF 5-6)

   Akilus, who had also seen the two vans speeding up to the neighbors house and his own driveway, saw a person dressed in all black from head to toe, with a black ski mask over his head, jump out of the van at the 921 address.  He did not see any "police" markings on the ban or on the person's clothing. Akilus took off running toward the back yard. (PSOF 9)

   The 11-year-old Javell and 12-year-old Darius also saw the vans and heard Jason yell, "Drive-

---

[2] Plaintiffs' Exhibits A through S were previously filed with the court in connection with Plaintiffs' Cross Motion for Summary Judgment against Lake County Metropolitan Enforcement Group in two volumes and are incorporated by reference herein. Exhibits T through V are filed separately herewith as volume 3.  The exhibits will be referred to as "Pl. Ex. A, B", etc. for purposes of this statement of facts.

by!" Javell ran into the house behind Jason Jr. and Darius followed him. (PSOF 6,8)

Akilus ran into the back yard with a plan to jump the fence next to their garage and keep running. As he was running he heard two male voices yelling, "Stop running!", but they did not say they were police and he had no intention of stopping because he was afraid. As he reached the fence and was getting ready to jump one of the men grabbed him by his jacket and slammed him down to the ground, yelling "Get down!", but Akilus was already down, having landed on his hands and knees with his face looking to the ground. He looked up to see two men wearing black ski masks. (PSOF 10-12)

As he lay down on the ground one of the men handcuffed him behind his back. He could see one of the men had a gun pointing at his head from two or 3 feet away. They still had not told them who they were and Akilus thought they were robbers or terrorists. Handcuffs were put on very tight and he complained to them about the pain but they ignored him. (PSOF 11-12)

While he was laying on the ground one of the men said to the other, "I'll take it from here." Then he took the left handcuff off, leaving the right one on, and handcuffed him to the fence. The men then walked away to the house, leaving Akilus alone and handcuffed to the fence for about a half hour. (PSOF 12)

12-year-old Jamese was in the dining room waiting for her grandmother (Jacqueline) to find her keys to go to the Club. She saw her little brother Jason come running past her, running straight up the stairs yelling, "Drive-by!". Then she saw Javell running up the stairs after Jason, with Darius running into the house after Jason. (PSOF 36)

Almost immediately after Jamese saw the three boys run up the stairs a man dressed in all black with a ski mask over his face came running into the dining room where she was, with a gun

4

in his hand. He yelled at her to "Get the F– down! Get down!", but before he even gave her a chance to get down grabbed her by the shirt and threw her into a bird cage and onto the dining room floor. As she was laying face down on the floor man grabbed her left arm and pulled it back very hard behind her back, and crouched down so that his knee was on the back of her neck. Then he took her right arm and brought it back and put both hands in handcuffs behind her back. The handcuffs were put on very tight and it hurt a lot.  He was holding a gun to her head, right by her face on the right side.  She started having difficulty breathing and was hyperventilating. (PSOF 37)

Darius tried to run to his mother's room but before he could get there somebody grabbed him from behind by the hood on his sweatshirt and slammed him to the floor yelling, "Get down! Get the F– down!", and put a gun to his head. (PSOF 49)

The man that threw Darius down to the floor was dressed in all black with a black ski mask over his head.  The man pulled Darius' right arm behind his back tightly and put a gun to his head.  Darius could feel the gun against his head between the braids of his hair.  The wristhold he was put in was very painful. (PSOF 50)

Joqui was in the upstairs bedrooms when Javell and Jason Jr. came running up. He saw that Jason Jr. was crying and was asking him why he was crying when he turned around and saw what the crying was about: right outside the bedroom was a woman dressed in all black with a ski mask, holding a gun with both hands and pointing it into the room at them.  Joqui thought they were being robbed.  He did not see anything on or identifying her as police and she never said that she was police. (PSOF 51)

The woman ordered the three boys to come out of the room and go downstairs.  Jason Jr. went

down the stairs first, followed by Javell and then Joqui. As Joqui was coming down the stairs the woman was now on the stairway watching the boys go down. As he walked past her she stuck out her foot and tripped him and Joqui fell down the stairs hitting his back on a vent that was right next to the foot of the stairs. (PSOF 52)

Joqui started to try to get up but one of the men in black yelled for him to get back down, which he did. Then one of them came over to where he was laying on his stomach and pointed a gun right to his head. He could feel the gun touching his head at the left temple. Joqui was kept on the floor for about 45 minutes. (PSOF 53)

When the six-year-old Jason Jr. got downstairs he was ordered to get on the floor. He did what they told them to do and lay down on the floor next to his grandmother (Jacqueline) who was s already laying face down there. One of the people in black had a gun pointed at Jason Jr.'s head while he laid there and he was crying the whole time. (PSOF 54)

When Javell got down the stairs he was also ordered to get down on the floor near his grandmother whom he saw was crying. From there he observed the woman in black trip Joqui as he was coming down the stairs. (PSOF 55)

11-year-old Jamell had been in the basement laundry room when he heard a loud noise and racket upstairs and went to see what was going on. When he got into the kitchen first thing he saw was somebody dressed in all black with a ski mask over his/her face pointing a gun to his face. There were other people dressed in all black with ski masks over their faces as well, but Jamell was not sure how many there were. (PSOF 56-58)

The person who threw Jamell down to the floor got down next to him and held him down by pushing his hands on the back of Jamell's neck so that his head was forced to the floor. He held

him like that until Jason Sr. was brought up by one of the men from the basement. Then the man got up off Jamell. Jamell remain laying on the floor with his head down on his right arm. He kept his left hand over his mouth because he was coughing and having trouble breathing. (PSOF 57-58)

The adults, George Harmon, Jacqueline Harmon, Shavanna Smith – Durham and Jason Durham, Sr., were similarly mistreated and abused: Jacqueline Harmon was thrown to the ground and ordered to stay there. As she was thrown down the front of her face hit an air vent and her nose started bleeding. (PSOF 38-39)

George Harmon had been sleeping in his bedroom when he was awakened by somebody grabbing him by the right wrist and pulling it up behind his back into a hammerlock. He could feel a weapon being held to his head touching him behind the left ear, but he could not see the person doing this. The person told him, "You need to get up." George asked, "What's going on? Who are you?" The man ordered him to, "Just shut up and get up!" Another person, dressed in all black with a ski mask over his face came into the bedroom and started going through the closets and drawers, throwing things around. George said, "before you tear everything up, I had a handgun under the bed in a lockbox and there is a key on the dresser." They found the key, located the lockbox, opened it, and found his handgun. George was marched into the dining room, stood up against the dining room wall and handcuffed. He remained in handcuffs for about an hour to an hour and a half after which he was taken in handcuffs to the Waukegan Police Department, where he was booked on a charge of possessing an unregistered handgun. (PSOF 40-43)

Shavanna Smith – Durham was in the basement of the house where she had fallen asleep

watching television with her husband Jason Durham, Sr., when she sensed someone near her which woke her up. When she opened her eyes there was a gun pointing straight into her face. There were two people dressed in all black wearing ski masks. They ordered her upstairs, one of them walking in front of her and the other behind her with a gun to her back. (PSOF 44)

Jason Sr., who had been in the basement went up the stairs to see what was going on. As soon as he stepped into the kitchen doorway a person wearing all black with a black ski mask over the face was pointing a gun at him, about a foot and a half away from him and yelling, "Get down! Get the F– down!", and then moved closer so that the gun was so close to his face that was almost touching. Jason was ordered to get down on the floor and put his hands over the back of his head. When he started to move a little bit the person with the gun screamed, "Don't move or I'll shoot!" He thought they were robbers or terrorists and stayed put because he didn't want to get shot. He was scared and trying to think of something he could do to prevent them from killing his family. At some point a man, not wearing a ski mask, asked Jason Sr. for information about his identification. Sometime later Jason was told there was a warrant for his arrest from Buchanan County, Missouri, which he was unaware of. He was handcuffed and brought to the police station in Waukegan.

**ARGUMENT**

A warrantless entry by police into a private residence for purpose of making an arrest is presumptively unreasonable under the Fourth Amendment unless it falls within one of several exceptions to the warrant requirement. <u>Katz v. U.S.</u>, 389 US 347, 357 (1967). Only one of those exceptions is implicated by the facts present here – namely, entry based on probable cause

**coupled** with exigent circumstances which make it impractical to obtain a warrant. *Id.* In other words the warrantless search in this case is presumptively unreasonable unless the Defendant police officers can show that there was probable cause to arrest the Plaintiffs, exigent circumstances **and** it was impractical to obtain a warrant. The police can not meet even one of these three prongs, let alone all three.

The sole basis for the warrantless entry into Plaintiffs' home is found in the Investigative report of Defendant Ken Free (PSOF 5; Pl. Ex. A), in which Free describes observing "2 black male subjects" running, the second of which, Darius Harmon, who was 12 years old, ran into the Plaintiffs' home at 915 Yeoman, two houses away from the target. Based on nothing further, Free writes, "I summoned S/A Dumont and S/A Jiminez and S/A Kropp and immediately entered 915 Yeoman..... in pursuit of Darius Harmon." Free is now deceased and was not deposed. The only other information we have giving Free's supposed justification for entering the home was when Defendant Zimmerman, who was the supervisor in charge of the buy/bust operation asked him why he entered the home. Zimmerman testified that Free told him "...(O)ne of the individuals that was in the area of the buy/bust we were doing, what we got out after the arrest signaled, got out to take the subject in custody, ordered that person to stop as well, and the individual took off running from him. So he gave pursuit right into the house."

Prior to execution of the buy/bust operation the LCMEG agents had a pre-operation meeting. There was no information related to the officers that there was any suspicion of criminal activity involving Plaintiffs' home at 915 Yeoman.

None of the Defendant officers Plaintiffs seek Partial Summary Judgment against in this motion had any probable cause to believe any of the Plaintiffs were involved in any criminal

activity whatsoever. It appears from their testimony that the only reason they went into the house was because Defendant Free went in:

Jiminez- Jimenez testified that he followed Free into the house. He testified that he heard somebody say that somebody was running or fleeing, but he did not see anybody running himself. Agent free said somebody had run into the house and so Jimenez followed Free in. Both had their guns drawn. Jiminez testified that prior to going into the Plaintiffs' house he did not see any activities which gave him probable cause to believe that a crime was in commission. No one knocked and announced prior to entry into the home and no one asked for permission to enter the home.

Zimmerman- Zimmerman was the supervisor in charge of the buy/bust operation. Prior to the operation there was no information that the people living at 915 Yeoman St. were involved in any kind of criminal activity. Zimmerman said that he went into the home because he received a "communication" that other agents were in the house and he went over to investigate.

Kropp- Kropp testified that he was at the preoperation and there was no information given that there might be any criminal activity at 915 Yeoman St. He did not observe any criminal act himself and when he entered the home he observed no evidence of any criminal activity. He never saw anybody running toward 915 Yeoman, never heard anybody yelling stop, police or anything like that, did not see any fleeing suspects, was not aware of any exigent circumstances, did not see anyone ask for permission to enter the house, did not see anybody knock and announce, and did not hear anyone ask for permission to enter the house.

Rodriguez- Rodriguez testified that he entered the house through the front door. Prior to going in he did not observe any suspicious or possible criminal activity at the house and when he

entered the home there was no evidence of criminal activity.

Schultz- Scholz testified that he was one of the agents who went into the house to help search. Prior to going into the house he did not observe anybody fleeing into it, did not observe any criminal activity at the house and was not aware of any suspected criminal activity. He never heard anybody ask for permission to enter the home.

Tokarz- Tokarz admitted that he was not involved in any "hot pursuit", did not see any criminal acts going on outside Plaintiffs' house prior to entering it, did not see any criminal acts inside when he entered, never asked for permission to enter and never heard anybody else ask for permission to enter. He nonetheless participated in the search of the home, including the basement area.

Dumont- Defendant Dumont claims that she doesn't remember anything at all about the evening in question even though she has been clearly identified by the other agents as having been one of the first ones into the home. She doesn't know why she went in the home, because she can't remember it.

Grunder- Defendant Grunder admits to going into the home, but also admits he knew of no criminal activity going on there. (Pl. Ex. F, p. 27-30)

Dador- Dador admits to having entered the house without consent. Prior to that he had not received any information from any source that there was criminal activity going on at 915 Yeoman. The only information he had was that somebody had fled the area and ran directly into that house. He did not know of any reason to believe that the person running had committed some criminal offense or was committing an offense. When he entered the home at 915 Yeoman the only information he had was that someone had run into the house. (Pl. Ex. T, p. 22-23, 26,

11

31-32, 35)

In other words, nobody knows why they were there, except that Free went in and therefore they all evidently believed it was okay for them to go in too. There is no evidence of probable cause that any of the Plaintiffs were involved in a crime. There are certainly no exigent circumstances described in any of the testimony. Finally, with all of these police officers present and able to seal off the house to prevent any escape there is absolutely no reason why it would be "impractical to obtain a warrant". Upon review of about 30 depositions it still remains impossible to discern why this raid occurred.

Even if it were true (contrary to the unrefuted evidence) that Darius Harmon heard Free yelling "Stop, police" as his report says he yelled, that fact would not amount to probable cause, exigent circumstances, or impracticality of obtaining a warrant. As Justice Stevens noted in his concurring opinion in the case of *Illinois v. Wardlow*, 528 US 119 (2000) a reasonable innocent person might run from the police for a number of reasons, including "an officer's sudden appearance indicates nearby criminal activity" or that "a substantial element of danger" is present *Id.* at 130, or, for some citizens, "particularly minorities and those residing in high crime areas, there is also the possibility that the fleeing person is entirely innocent, but, with or without justification, belief that contact with police can itself be dangerous, apart from any criminal activity associated with the officer's sudden presence. *Id* at 132.

In the instant case, Darius's flight into the safety of his home at the site of several undercover police officers charging at him with guns drawn was neither "unprovoked" nor unreasonable.

The police bear a "heavy burden" in demonstrating an urgent need to justify a warrantless search or arrest. *Welsh v. Wisconsin,* 446 US 740, 750 (1984) These officers have not

demonstrated an "urgent need". They have not demonstrated any need at all. It is the law in this Circuit that police may not enter or search a person's home without a warrant "(U)nless there is an **emergency**, what in legal jargon, because our profession disdains plain speech, are called "exigent circumstances'". *United States v. Collins,* 510 F. 3d 697, 699 (7th Cir. 2007, emphasis added).

   Regardless of whether the undercover Defendant officers illegally entered the Harmon residents under exigent circumstances, their search of the entire home without a warrant is separately violative of the Force Amendment. Once a home is entered under exigent circumstances, a subsequent search must be justified by a warrant or an exception to the warrant requirement. *U.S. v. Rivera,* 825 F. 2d 152, 257 (7th Cir. 1987). The Defendants here did not have a search warrant, and there were no exceptions to the warrant requirement present that would justify the scope of the search and seizures conducted.

   When officers enter a private residence in pursuit of a fleeing suspect under exigent circumstances, once they locate the suspect the exigent circumstances that justified their entry (*e.g.* escape of a fleeing felon) are eliminated, and any subsequent search must be justified by a warrant or an exception to the warrant requirement. Moreover, in no event can the search extend beyond the area the people creating the exigent circumstances are found in. *U.S. v. Robles,* 37 F. 3d 1260, 1263 (7th Cir. 1994), *People v. McPhee*, 256 Ill. App. 3d 102, 110 (1993)

   In this case, even if the officers were justified in entering the Harmon home to arrest Darius, they were not justified in conducting a top to bottom search thereafter. Once the officers located Darius, a subsequent search could be made only under the authority of a search warrant particularly describing the place to be searched and the items to be seized. See, *Chimel v.*

*California,* 395 US 752, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969)

In this case not only did the officers continue the warrantless search after locating Darius they then proceeded to put each and every one of the Plaintiffs under arrest ""in custody and under control", according to Defendant Kropp. None of the Plaintiffs could reasonably believe they were free to leave the scene, indeed, the Defendant officers testified that restraining their freedom was necessary to "secure" the premises. The usual Illinois definition of the common – law tort of false imprisonment is an unlawful restraint of an individual's personal liberty or freedom of locomotion, against his will. *Luker v. Nelson,* 341 F. Supp 111 (ND Ill 1972), *Baltz v. Shelley* 661 F. Supp 169 (ND Ill 1987) False arrest is one means of committing false imprisonment. (PSOF 19, 28, 32)

George Harmon was charged with possession of an unregistered handgun after the search. On March 21, 2005 his attorney filed a Motion to Quash and Suppress. (Pl. Ex. R) On July 8, 2005 and motion of the State's Attorney the charges were dismissed, <u>*nolle prosequi.*</u> (Pl. Ex. S) A simple way for this court to look at this motion is to ask itself if it have granted the motion to quash had it come before this court? Would this court have allowed the handgun obtained by these Defendants, by these means, to be used against George Harmon, or would this court find that it was the product of an illegal search and seizure?

## CONCLUSION

The Defendants did not have any probable cause to arrest Darius Harmon or any of the

other 10 Plaintiffs. They did not have a warrant or consent for the entry into the home or for the subsequent search. Had they tried to obtain a warrant on the flimsy suspicions apparently one of them had they would have been unlikely to obtain one.  There were no exigent circumstances (emergencies) justifying the warrantless search or the subsequent outrageous behavior. There is no genuine issue of material fact that the respondent Defendants' falsely arrested, imprisoned and detained the Plaintiffs without due process, in violation of the Fourth and Fourteenth Amendments (Counts I and II) and falsely arrested and imprisoned the minor children under Illinois state law(Counts V and VI), and Plaintiffs are entitled to judgment as a matter of law.

WHEREFORE, Plaintiffs respectfully pray for Summary Judgment on Counts II, III, V, and VI, VIII, and IX of the First Amended Complaint against Defendants Ken Free, Chris Dador, Wendy Dumont, Anthony Grunder, Johnny Jiminez, Clarence Kropp, Michael Rodriguez, Keith Schultz, Aaron Tokarz and Patrick Zimmerman and for trial by jury on the issue of damages as to those Counts, as well as trial by jury on the remaining counts of the First Amended Complaint, and for such other and further relief as this court may deem just and appropriate.

      //s// Gregory X. Gorman
One of the Attorneys for Plaintiffs

Gregory X. Gorman  
220 S. Halsted Street  
Suite 200  
Chicago, IL 60661  
312-332-4240

JAMES A. STAMOS  
61 W. Superior St.  
Chicago, IL 60610  
312-243-1722